An innkeeper is not an insurer of his guests' safety. The duty of an innkeeper is to exercise ordinary care in furnishing to his patrons such premises as are reasonably safe. It is likewise the duty of the patrons to exercise ordinary care for their own safety.
 DECIDED OCTOBER 12, 1945.
M. A. Wilkinson Jr., sued Hotel Richmond Inc., and recovered damages for an alleged injury received as a paying guest of the defendant. In the early evening, it was alleged, that the plaintiff, after being assigned to his room, took a bath, dressed, left the hotel, had dinner, attended a picture show, and returned to the hotel at about 11 o'clock; he retired and, after doing so, heard water dripping from the faucet in the bathroom. He arose, went to the bathtub, leaned over it, opened and closed the cold water faucet with his right hand, and undertook to open and close the hot water faucet with his left hand. He opened and closed both faucets in the normal way, with only the necessary pressure to close a properly functioning faucet. In attempting to close the hot water faucet, the porcelain or china handle crushed in his left hand and severely injured him.
The alleged acts of negligence were: (a) in having in the hostelry a faucet that would break in turning off the water; (b) in not inspecting the faucet to ascertain that it was in proper condition; (c) in not providing guests with safe facilities for their use; (d) in not repairing or replacing the faucet when it was discovered, or would have been discovered by ordinary care and diligence, to be defective.
The defendant answered, denying negligence on its part, and *Page 37 
further alleging that the negligence of the plaintiff caused his injuries, if any, in substantially the following particulars: (a) in failing to report to the proper officer of the defendant company that he was unable to turn off the hot water without applying such pressure as he apparently considered necessary at the time of the alleged injury; (b) in undertaking to turn off the hot water in the manner alleged in the petition by applying more pressure than would ordinarily be necessary, and in applying such excessive pressure failing to exercise ordinary care and prudence on his part; (c) in failing to exercise ordinary precaution in ascertaining whether or not the said porcelain handle was in such a condition, by showing cracks therein, or otherwise that it would break by the mere act of turning off the water. The answer further pleaded: that these negligent acts of the plaintiff were the sole proximate cause of his alleged injuries; that, even though the defendant was negligent, which it expressly denied, the plaintiff's alleged injuries were caused by a failure to exercise ordinary care and diligence to avoid the consequences of the defendant's negligence; that, if the defendant was guilty of negligence as alleged by the plaintiff, which was expressly denied, still the plaintiff was negligent in the particulars above specified, and the plaintiff's negligence was equal to or greater than the negligence of the defendant; and further that, if the defendant was guilty of any or more of the acts of negligence, which was expressly denied, the negligence of the plaintiff, as specified, would diminish any damages to which he might be entitled, as alleged in his petition, and any recovery of the plaintiff should be diminished in proportion to the comparative acts of negligence of the defendant; but that the plea of the defendant should not be construed as any admission of any liability to the plaintiff, which the defendant expressly denied.
The trial resulted in a verdict for the plaintiff. A motion for new trial was filed by the defendant on the general grounds and a special ground, added by amendment. This special ground is but an amplification of one phase of the general grounds. The motion was denied, and the defendant assigns error.
Aside from the evidence touching the injuries, which the plaintiff is alleged to have received, and their extent, the evidence shows substantially: according to the plaintiff's testimony," to sustain the allegations of his petition, particularly, that he used no more pressure *Page 38 
than was usually normal to open and close the faucet; that he did not throw any unusual weight against the porcelain handle; that he used no more pressure than he usually did to open and close faucets; that it was a tile bathroom, and he stood on the tile, reaching across the width of the tub, leaning somewhat forward; and that he did not have complete control of his balance when he pressed the handle. On cross-examination, he testified: That the light was on when he went to the bathroom to turn off the water; the faucet was about two feet from the floor; the plaintiff got a full grip on it, and did not use a finger grip. The faucet was on down-stroke when it broke. The plaintiff did not lose his balance and fall over. He did not notice whether or not there were any cracks on the handle, and did not know if he would have seen them if there had been. He did not notice anything on it. The handle was made of china, a brittle substance. It was porcelain or china. He did not know how much pressure would break it, but assumed that too much pressure would break it. He did not recall that the water was running when he got from under the shower early in the evening. It was earlier in the day and the plaintiff was not as likely to notice it then as he was later on at night when things were quiet. The plaintiff made no effort to report to the hotel that the water was running. So far as he knew it had not been turned off and he tried to turn it off; and so far as he knew the fixture was in perfectly good condition. He was not a mechanic and is not left-handed. The plaintiff did not recall that there was a bath mat. He thought he probably hung it up. If he was leaning over in a close place, he would be out of balance. If he had been depending on the handle of the faucet to keep his balance, he would have gone over when the handle broke.
A doctor testified for the plaintiff that, the wound was about a half inch deep; and that its depth indicated considerable pressure on the object that caused the wound.
There was testimony for the defendant as follows: The house physician testified that he was called to see the plaintiff at about 11:30 p. m. and saw the wound; that the plaintiff stated that he was cutting off the water above the tub and the handle broke and cut his hand; that the wound was about an inch in length and approximately a half inch deep; that the witness had been an employee of the defendant for approximately seven years, and knew *Page 39 
the type of faucet in the hotel bathroom; that he had on occasions turned on the shower, and was familiar with the amount of pressure it took to turn the showers on and off; that the particular wound of the plaintiff required a good deal of pressure. The wound was not a simple laceration of the skin, as you would expect in not too gently pulling down a piece of metal with agate on the end. He stated that he would say it required a good deal to produce the wound in the plaintiff's hand. On cross-examination, the same witness testified: that he did not know how much pressure was put on the faucet to turn it off or on; that this would be governed to some extent by the newness of the valves or washers; that the "valves may be old and worn and you can almost flip them around, and others would be new washers and would take more pressure to turn." He stated further that he did not see the china knob in the room the plaintiff was occupying, and he did not examine the metal part that was left; that the witness had a shower with a china knob; that one would be in a stooping position to turn the faucet off from the outside, and, if one were stooping, it would have a tendency to unbalance him if the handle gave away as he was turning it; and that, after the china broke, "Losing your balance would have a tendency to cut that hand by the metal screw." He also stated: that china is a form of glass, and a person could sustain a cut from it about as easily as from glass; that in some parts of the hotel the china faucets have been replaced with metal faucets; and that he had told the manager who preceded the present one that, if he could, he should get some metal handles because of the two accidents which had occurred on the part of the maids. The witness had suggested that the manager replace all the china handles as rapidly as he could, and he might have said the same thing to the present manager. The hotel was built approximately 25 years ago; the faucet handles had been broken before the plaintiff's injury, but somebody broke them, they would not just break themselves; the maids broke them by undue pressure, but the lacerations on the maids' hands were minor cuts; there were two such occasions; with a new washer on a faucet, a good deal of pressure is required to turn it off, with a bad valve one can not turn the water off; and the purpose of the lever is to cut the water off.
A witness engaged in the plumbing business testified; that at *Page 40 
the time the defendant's hotel was built all better faucets had china handles; that he was familiar with the type of faucets in this hotel; that the china faucets were made by the Standard Manufacturing Company, one of the best; that later-model faucets had metal handles on them; that there are various kinds of faucets and handles; that some prefer one and some prefer another. The witness described the condition of the broken handle which occasioned the injury to the plaintiff; that a crack in a china handle would soon discolor it; that, from the experience of the witness, it was his opinion that the faucet handle was not cracked before the injury, and if it were cracked the crack had not existed long. The witness further testified: that the style more than anything else determines the type of handle to the faucet; that, if porcelain or china handles are used on the faucets, under proper treatment they will not break in their ordinary turning, in ordinary use they would not have any reason to break; that it is possible some one ahead of the user had mistreated and cracked it; and that another person comes along and gets the results of such abuse.
On cross-examination, the same witness testified: that he had equipped his own house with porcelain-china-handle faucets; that such a handle is dangerous because it breaks and is sharp and jagged; that the metal piece goes down in it to give support and helps a good deal; that without the metal the handle would be inclined to break easier; that china handles break, not quite frequently, not at the slightest provocation, but a certain amount of pressure must be applied, they will stand a pretty good pressure; that the witness did not know the exact amount of pressure it takes to break them; that he did not work for the hotel; that it takes a few weeks for a crack to appear in a china faucet; and that metal handles are safer.
The chief engineer of the defendant hotel testified: that his duty is maintenance repair of the hotel plumbing, and that the next day after the accident he inspected the plumbing in the room which the plaintiff had occupied; that he had no call to inspect the plumbing that night; that he had very little trouble with any of the faucets in the hotel; that, when notified as to any defects as to washers, leaks, or drippings, the defect would be attended to; that the witness received the reports from the housekeeping department; that the plaintiff did not report any trouble with the *Page 41 
plumbing on the night of the injury; that some of the handles in the hotel are metal; that the defendant had tried to get metal handles, but was unable to do so on account of the war; that china handles will break due to excessive handling or excessive force; that the witness had been with the defendant hotel since 1939; that, if the handle is broken by pressure, it shows no discoloration; that the witness had seen quite a few broken handles.
On cross-examination, the same witness testified: that commonsense shows that china is weaker than metal; that he estimated that during his six years at the hotel he had changed over 30 or 40 in a year, not all broken, but some with discolorations and cracks; that he inspects a room when he has orders to do so — it is the housekeeper's job to report; that the only time the witness recalled inspecting the room in question was on the morning after the injury; that a china faucet will not break in normal pressure, but it takes excessive force.
The housekeeper testified: that it is her duty to make daily inspections of the rooms and to report any defects; that the porcelain handles on the shower baths were inspected daily; that she recalled when Mr. Wilkinson cut his hand — she did not recall at what hour he cut it, but knew that the room was inspected daily by her or her assistant, and there was no report of any difficulty; that the witness is not an expert in porcelain; that, when the rooms are inspected, the faucets are turned off and on to see if they are in working order and whether they should be inspected by the plumber or the engineer; that she did not know whether she inspected the room or whether the other lady did, but she did know that one of them did; and that housekeepers have a chart by which they work.
The manager of the defendant company's hotel testified: that the hotel was constructed in 1923, and he has been employed there since September, 1942; that the hotel had every metal chromium-plated handle they could procure since the witness went with the hotel; that he returned to the hotel at about 12:30 a. m., and had a conversation with the plaintiff; inquiring why the plaintiff did not call someone to replace the possibly defective washer, and stating that any amount of pressure would cut the water off, and that the plaintiff should have put a towel under the drip to keep from hearing it; that a daily inspection is made of every room, and a *Page 42 
report is made "to me" if there is any defect; that no report was made to the witness of the defective plumbing in the room occupied by the plaintiff; that the witness was buying as many metal handles to faucets as he could possibly get, and would have replaced all of them by this time, if he could have procured them and thrown all of the china ones out. The witness stated: that he could not buy a great many of the chromium ones; he did not know whether in 1938 or 1939 a good many of them could have been purchased; that one can get all the metal ones desired, but they are made of war-time metal, as safe as others (presumably meaning chromium). He further testified: "I remember some remark by Dr. Levy to the effect that night that he told me that he had warned me about these handles. I do not remember exactly what it was. I would put it just a little bit different. He said, as I recall, that, `I have told Mr. Campbell that these things are dangerous.'"
In our opinion there was sufficient affirmative evidence to support the allegations of the petition and to sustain the verdict. This being so, we will not discuss the Georgia rule of evidence generally known as the doctrine of res ipsa loquitur. A hotel is not an insurer of the safety of its guests. Both counsel in their briefs seem to be in accord that, "under Georgia law, an innkeeper owes to his patrons the duty to exercise ordinary care to afford them premises that are reasonably safe for use and occupancy." Hotel Dempsey Co. v.
Teel, 128 Fed. (2d) 673; Holloman v. Henry Grady Hotel Co.,42 Ga. App. 347 (156 S.E. 275). Thus, it was the duty of the defendant to use ordinary care and diligence to furnish to the plaintiff a reasonably safe room. On the other hand, it was equally the duty of the plaintiff to exercise ordinary care and diligence for his own safety. The evidence in this case clearly made an issue of fact for the jury. They resolved the issue against the defendant. The evidence did not, as a matter of law, demand a verdict for either party. This being true, and the trial judge having approved the verdict this court is without authority to disturb it. There is no assignment of error on any question of law during the progress of the trial.
Judgment affirmed. Broyles, C. J., and MacIntyre, J.,concur. *Page 43